## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSEPH GUENTHER, an individual, and MICHELLE G. RYERSON, an individual,<br><br>      Plaintiffs,<br><br>v.<br><br>OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY, a Minnesota Corporation,<br><br>      Defendant. | Case No. 1:12-cv-00237-REB<br><br>**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW** |

## I. BACKGROUND

In June 2009, Plaintiffs Joseph Guenther and Michelle G. Ryerson ("Plaintiffs")

purchased a parcel of real property ("Property") in the Boise foothills of Ada County. The only

physical roadway route to the Property is commonly known as the Barnes Main Access Road,

which intersects with Hill Road, between North Pierce Park Lane and Seamans Gulch Road:



Part and parcel with the Property's purchase, Plaintiffs contemporaneously obtained a

policy of title insurance ("Policy") from Defendant Old Republic National Title Insurance

Company ("Old Republic"). The Policy was issued in the amount of $157,900 and, among other things, included the following defects of title as "Covered Risks": (1) "Unmarketable Title," and (2) "No right of access to and from the Land."

Shortly after purchasing the Property, Plaintiffs sought approvals and permits to construct improvements on the Property, but were denied by governmental authorities who said there was no legal right of access to and from the Property. Owing to the absence of legal access rights to and from the Property, Plaintiffs tendered proof of loss under the Policy to Old Republic, requesting that it defend and indemnify the right of access under, and the marketability of title to, the Property. Old Republic denied coverage, relying on the fact that unfettered physical access to the Property existed (and has always existed) by way of the Barnes Main Access Road, regardless of any legal right of access to use that roadway.

After Plaintiffs were unable to convince Ada County that they did, in fact, have a right of access to and from the Property, this lawsuit followed.

Relevant here, it is undisputed that the Policy provides coverage if there is "no right of access to and from the [Property]." It is also undisputed that, since purchasing the Property in June 2009, Plaintiffs (and other neighboring property owners) have always been capable of *physically* accessing the Property. The question of whether physical access amounts to "right of access" (as that latter term is used in the Policy) was previously addressed in the context of Old Republic's motion for summary judgment.

There, to test Plaintiffs' claims against it, Old Republic argued that, because Plaintiffs have always been able to physically access the Property, they have likewise always had a "right of access" to and from the Property and, thus, there is no coverage under the Policy. Plaintiffs

disagreed, arguing that, while they may never have been physically prevented from accessing the Property, they nonetheless had no *legal* right of access to the Property (in essence, that they *could* have been physically prevented from accessing the Property) and, without such access, there is coverage under the Policy. The Policy did not define "right of access."

After considering the parties' arguments, and applying the legal standard for interpreting insurance contracts in Idaho, this Court ruled that the Policy did not clearly and unambiguously provide coverage only when there is no physical access to the Property, as Old Republic asserted in summary judgment briefing:

> Had the Policy insured against losses incurred by reason of, simply, "no access" to the Property, Old Republic's argument would have more persuasive sway. But it doesn't. The Policy adds the term "right of" to modify the word "access" which must provide substantive meaning that Old Republic's interpretation of the Policy does not address, beyond equating it to physical access. Therefore, while Old Republic's reading of the Policy might be a reasonable one, so is Plaintiffs' retort that coverage applies when there is no legal access to the Property, identifying the term "right of" as meaning "legal." In other words, at the very least, the parties have conflicting interpretations about what the Policy covers by way of access to the Property.

Owing to these conflicting interpretations, this Court ultimately found the Policy to be ambiguous as to coverage. In such a setting, Idaho law required that the Policy's terms in that regard be construed as a matter of law in favor of Plaintiffs (the insureds) and against Old Republic (the insurer). In turn, this Court went on to find that the Policy provided coverage in instances where no right of access – *legal* access – existed to and from the Property. As a result, Old Republic's motion for summary judgment was largely denied.[1]

------

[1] Old Republic's motion for summary judgment was granted in only two limited respects: Plaintiffs' breach of contract claim and intentional infliction of emotional distress claim were dismissed.

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 3**

But that didn't end the dispute; it instead highlighted additional unanswered questions. Specifically, whether a legal right of access to the Property actually existed during the relevant time period remained an unsettled question based on the record up to that point. That is, even though it was understood that the Policy provided coverage when no legal right of access to the Property existed, to prevail, Plaintiffs still had to prove that they had no such right and, in doing so, contend with Old Republic's arguments to the contrary.

Against this backdrop, the parties agreed to proceed with a bifurcated trial, stipulating that the sole issue to be resolved by this Court during the first portion of the trial was whether Plaintiffs indeed had legal access to their Property as of June 15, 2009 – the date the Policy was issued. The parties further stipulated that the resolution of that issue required the determination of some or all of the following discrete sub-issues:

1. Whether the Barnes Main Access Road was improved as required by the 1973 Grant of Easement between Terteling Land Company and Joseph and Lillian Barnes (the "Easement");

2. If not, whether the Easement's reversionary clause was automatic or subject to a right of re-entry;

3. If the Easement was subject to a right of re-entry, whether the requisite action was taken by Ada County and/or its predecessors-in-interest to terminate the Easement; and

4. If the Easement terminated, whether legal access existed by virtue of any of the following alternative access theories: (1) Idaho Code § 40-202/Public Right-of-Way; (2) Quasi-Estoppel/Permissive Use; and (3) Easement by Prescription.

Framed thusly, a two-day bench trial began on April 28, 2014. During the trial, the following fact-witnesses testified: (1) Richard Guenther, (2) Richard Beck, (3) James R. King, Jr., (4) Ruth Browning, (5) Flinda Terteling, (6) John Farmer, (7) Steven Price, and (8) Randy Noble. No expert witnesses testified.

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 4**

The case was well-tried, by counsel who were prepared and thoughtful advocates. As is often true for civil cases that come to trial, the issues and their economic consequences were important to both parties, and the parties were in significant disagreement about such matters. The Court has carefully considered the arguments of counsel, the testimony of the witnesses, the exhibits admitted, and has weighed and compared the particulars of such argument and evidence. The Court must measure the evidence and hone through the arguments as it has done here, to draw findings of fact and conclusions of law as to how the Court is persuaded (or not persuaded) by the arguments and evidence presented at trial, as considered against the legal standards setting out the elements that Plaintiffs must prove to succeed on their claims, and as to the burden of proof they must meet, or Old Republic must meet, in seeking to prevail on such claims, or upon defenses to such claims. Those findings and conclusions follow in this decision.

## II. <u>FINDINGS OF FACT</u>[2]

The Court makes and enters the following Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a). All Findings of Fact referred to herein, unless otherwise qualified or limited, apply the preponderance of the evidence standard.

To the extent this Court has concluded that any evidence in the record does not support certain claims or defenses made by the respective parties, it will not be included in these Findings of Fact or otherwise referenced. The failure to mention an event or series of events in these Findings of Fact is not an oversight or unintentional omission, but rather an indication that the evidence does not support a finding and/or conclusion in favor of the claim alleged. *See*

---

[2] To the extent any of the facts stated in this Section can be considered Conclusions of Law and are not restated in Section IV, they are incorporated by reference into the relevant Section below.

*White Indus., Inc. v. Cessna Aircraft Co.*, 845 F.2d 1497, 1499 (8th Cir. 1988) (Rule 52(a) does

not require particularized findings on each piece of evidence parties present at trial).  With these

principles in mind, here are the Court's Findings of Fact:

**A.     The Parties**

1.      Plaintiffs Joseph Guenther and Michelle G. Ryerson are, and at all relevant times

have been, residents of Boise, Ada County, Idaho.  (Compl., ¶¶ 1-2 (Docket No. 1, Att. 5); Ans.,

¶¶ 2-3 (Docket No. 5)).

2.      Defendant Old Republic is, and at all relevant times has been, a Minnesota

corporation engaged in the business of selling title insurance in the state of Idaho.  (Compl., ¶ 3

(Docket No. 1, Att. 5); Ans., ¶ 4 (Docket No. 5)).

**B.     Jurisdiction and Venue**

3.      This Court has subject matter jurisdiction based on diversity of citizenship,

pursuant to 28 U.S.C. § 1332(a).  The amount in controversy, exclusive of interest and costs,

exceeds the sum of $75,000.

4.      Venue properly lies in this District, pursuant to 28 U.S.C. § 1391(a)(2), because it

is the District in which a substantial part of the events giving rise to the claims occurred, or a

substantial part of the property that is the subject of this action is situated.

**C.     The Property and the Barnes Main Access Road**

5.      The Property is located entirely in the Northwest Quarter of Section 18, Township

4 North, Range 2 East, Boise Meridian, Ada County, Idaho.  (Pls.' Exs. 1034A & 1034B; Day 1

Tr. 50:11-17).  Generally speaking, the Property is located in what is known as the Boise

foothills.

6.      The only way to access the Property is via the Barnes Main Access Road ("Road"), a dead-end road that intersects to the north off of Hill Road, between North Pierce Park Lane and Seaman's Gulch Road.  (Pls. Exs. 1034A & B; Day 1 Tr. 50:18-25; 9/26/13 MDO, p. 2 (Docket No. 81)).  For the purposes of the first portion of the bifurcated trial, the only portion of the Road over which there is a dispute as to Plaintiffs' access rights is that which crosses through the Southeast Quarter of the Northeast Quarter of Section 13, Township 4 North, Range 1 East, Boise Meridian, Ada County, Idaho.  (Stip. (Docket No. 146)).

7.      Before reaching the Property, the Road runs through real property previously owned by Terteling Land Company and The Terteling Company, Inc. ("Terteling").  (Joint Ex. 16).  In the early 1970's, Joseph Barnes and Lillian Barnes ("Barnes") owned most of the real property "upstream" from the Terteling property, including the at-issue Property.  (Joint Exs. 8 & 11).

8.      On January 10, 1973, by "Warranty Deed" (Instrument No. 834167), the Barneses attempted to convey to John and Ruth Browning ("Browning") certain real property in Section 18, as well as use of the Road beginning at Hill Road and proceeding into Section 18, including the portion of the Road that crossed the land owned by Terteling.  (Joint Ex. 12).

9.      On January 23, 1973, by "Grant of Easement" (Instrument No. 834380), Terteling granted to Joseph Barnes an easement for access across the Terteling property (including the same portion of the Road that the Barneses attempted to convey to the Brownings on January 10, 1973).  (Joint Ex. 1).  Integral to this action, the Grant of Easement included the following proviso:

> Provided, however, that if Grantee shall not by December 31, 1977, have improved said right of way to the standards of a "Minor Rural Road" as specified by the Ada

County Highway District, to wit, a 24 foot road bed surfaced with 7 inches of 2-inch crushed gravel, compacted, topped by 3 inches of 3/4-inch crushed gravel, compacted, and with normal borrow pit sections on each side, then on that date said easement or right of way shall revert to the then owner of the servient tenement.

*Id.*

10.     On January 29, 1973, by "Grant of Easement" (Instrument No. 834381), the Barneses attempted to grant to the Brownings an easement over the same portion of the Road that the Barneses had attempted to deed to the Brownings on January 10, 1973 (and over which Joseph Barnes had obtained only an easement right from Terteling by the January 23, 1973 Grant of Easement).  (Joint Ex. 13).

11.     On February 14, 1974, by "Deed of Dedication" (Instrument No. 874845), the Barneses attempted to convey a right-of-way to the public for use of the Road (including the portion of the Road over which Joseph Barnes had obtained only an easement right from Terteling by the January 23, 1973 Grant of Easement).  (Joint Ex. 2).

12.     On August 23, 1974, by "Warranty Deed" (Instrument No. 887247[3]), the Barneses deeded the Property to Edna Wyckoff ("Wyckoff").  (Joint Ex. 5, Bates GUENTER000549-51).

13.     On October 10, 1975, the Barneses attempted to re-record the "Deed of Dedication" (Instrument No. 7531016)[4], originally recorded on February 14, 1974, including therein an additional section of the Road located entirely within Section 18.  (Joint Ex. 3).

---

[3]  Owing to photocopying's limitations, the August 23, 1974 "Warranty Deed" is (and has been) referred to at various times as Instrument No. 837247 instead of Instrument No. 887247. The Court has attempted to make this change (and uses Instrument No. 887247) throughout to avoid additional confusion.

[4]  The original Deed of Dedication is reflected in Instrument No. 874845; a handwritten "re-record" follows the reference to Instrument No. 7531016 on Joint Exhibit 3.  Therefore, the Court uses Instrument No. 7531016 to represent the October 10, 1975 Deed of Dedication.

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 8**

14.     On February 2, 1978, the Ada County Highway District ("ACHD") responded to a request for information from Wyckoff concerning "a proposed development [she] may have off the Main Barnes Access Road," stating in relevant part:

> At this time you were wondering what would happen to the main Barnes access prior to any development in that area. It would be my recommendation to the Commission that first of all, the Main Barnes Access Road would have to be dedicated. Presently, this road is a private drive.

(Pls.' Ex. 1006).

15.     On November 22, 1978, ACHD's Board of Commissioners recognized that the Barneses never owned the land they purported to dedicate on February 14, 1974 and October 10, 1975, stating:

> Fifty feet of right-of-way was deeded to the Highway District. A portion of this deeded property was not owned by the property owner who deeded it. This portion belongs to Terteling Land Company. . . . . Terteling Land Co. is not willing to pay for any improvements through their portion of the property.

(Pls. Ex. 1012, Bates ACHD000655). Additionally, ACHD suggested that "the property owner should get together and try to acquire the parcel owned by Terteling Land Co." and that "Commissioner Fairbanks directed staff to meet with the property owners to discuss the possibilities of improving the road." *Id.*

16.     On September 30 1984, by "Warranty Deed" (Instrument No. 8449105), Terteling conveyed to Ada County the real property in Section 13 where the Road is located. (Joint Ex. 16). The Warranty Deed conveying title to that property makes no specific mention of any easement (or ownership of the Barneses) over the Road. *Id.* Even so, the October 2, 1984 title policy and corresponding title commitments relating to the September 30, 1984 transaction

indicate as "Special Exception" No. 16,[5] the following:

> An easement containing certain terms, conditions and provisions affecting a portion of said premises and for the purposes stated herein.

| | |
|---|---|
| For: | Right of way and right to pass and repass |
| In Favor of: | Joseph B. Barnes |
| Recorded: | February 2, 1973 |
| Instrument No.: | 834380[6] |
| AFFECTS: | A 50 foot strip in the Southeast quarter of the Northeast quarter of Section 13, Township 4, North, Range 1 East. |

(Old Republic Ex. 2001).

17.     On January 22, 1986, the official plat of the Hidden Hollow Subdivision was recorded with the Ada County Recorder (Instrument No. 8603849).  The plat identified certain easement rights, but not any easement rights reflective of the January 23, 1973 Grant of Easement from Terteling to Joseph B. Barnes.  (Joint Ex. 5, Ex. 51 therein; Pls. Ex. 1008).

18.     On September 25, 1986, Ada County denied a request to establish a private road on a portion of the Road, citing a lack of any perpetual access easement:

> Please be advised that the Ada County Planning and Zoning Commission at its meeting of September 25, 1986 voted to deny your application for a private road. This denial was based upon the fact that you do not possess the necessary perpetual easements needed to provide access to a public right of way across the adjoining property.

> As the Commission stated, it is hoped that the problem of access for properties along the Main Barnes Access Road will be resolved in the near future by forthcoming development proposals from developers working with the remaining Barnes property in the area.  Please be assured that we will keep you advised of any progress or submitted applications which would affect the question of access for your property.

(Joint Ex. 5, Ex. 52 therein).

---

[5]  Old Republic's Exhibit No. 2001 appears to contain different "Schedules."  Regardless, an earlier-referenced "Special Exception" No. 16 appears to be identical to a later-referenced "Special Exception" No. 17.

[6]  Instrument No. 834380 is the January 23, 1973 Grant of Easement from Terteling to Joseph B. Barnes.

19.     On July 28, 1988, the Board of Ada County Commissioners approved the Quail Hollow Subdivision, including a conditional approval of the Road as a private road, subject to the applicants' acquisition of an easement from Ada County "for access across County lands in Hidden Hollow Subdivision." (Joint Ex. 5, Ex. 43 therein). However, neither the Record of Survey 1334 (recorded on November 10, 1988) (Instrument No. 8855626), nor the Record of Survey 1358 (recorded on December 27, 1988) (Instrument No. 8863197) identifies an easement for the Road. (Joint Ex. 5, Exs. 53 & 54 therein). The conditions of the Quail Hollow Subdivision approval not having been met, the approval expired on July 28, 1990. (Joint Ex. 5, Bates GUENTHER000489).

20.     On October 20, 1992, after inspecting and reviewing the "Barnes Access Road," ACHD indicated that it would "accept the road as a public road if it is brought up to acceptable standards," including having the right-of-way dedicated. (Pls. Ex. 1005).

21.     In 1998, consistent with Resolution No. 542,[7] the Road was located and placed on ACHD's official map ("Official Map"). (Day 2 Tr. 69:17-70:6; Joint Ex. 17). From 1998 to at least 2009, the Road has been located and placed on ACHD's Official Map as an undetermined public right of way. (Day 2 Tr. 72:13-74:18).

22.     On October 29, 1999, Ada County Development Services issued a "Property Status Report." (Old Republic Ex. 2003). Therein, the Property Status Report concluded that, although the Property had frontage along the Road, the Road "was not a public street or an approved private road" and, as a result, the Property did not have access to a public street for the

---

[7] Resolution No. 542 adopted ACHD's official roadway map, generally; it did not operate to formally accept the February 14, 1974 Deed of Dedication from the Barneses to the public. (Day 2 Tr. 85:22-86:23).

purposes of obtaining a building permit. *Id.* Still, the Property Status Report indicated that the Property was nonetheless eligible for a building permit because (according to the development standards of the Rural Preservation zone) a manufactured home had been legally placed on the Property prior to 1985. *Id.*

23. On or around June 26, 2003, Ada County Development Services issued a zoning certificate and building permit for a new dwelling on a parcel adjacent to, and "upstream" from, the Property. (Old Republic Ex. 2004).

24. On May 9, 2005, Kathy Smith, Senior Right-of-Way Agent with ACHD's Right-of-Way & Development Department, Right-of-Way Division, wrote an "inter-office memo" regarding the Road and its alleged dedication:

> The Barnes Access Road aka Main Barnes Access Road was deeded to the public between 1974-1976. The road had already been constructed by the Barneses and functioned as a private road. . . . .
>
> The Barnes family recorded the instruments, not ACHD. Since ACHD didn't record the instruments, ACHD never officially accepted the road right of way.
>
> In 1978, Gary Funkhouser, ACHD's Engineer wrote a letter to Mrs. Edna Wyckoff, a property owner on Barnes Access, which informed her that the road would need to be dedicated, brought up to ACHD standards and the bridge at Hill Road widened to accommodate the traffic. . . . .
>
> The status of Barnes Access Road is brought up every couple of years and each time, ACHD tells the property owners that live on the road that ACHD has never accepted the road and therefore, does not maintain it.
>
> When J Schweitzer was ROW Division Supervisor, there was dispute between the two property owners along the west edge of Barnes Access Road, just north of the bridge. As I recall, J was involved in the discussions and in the end determined that since ACHD never accepted the road, ACHD had no say in the access dispute. . . .
>
> I have talked to several people recently who asked for the status and I reminded them that ACHD does not maintain the road nor the bridge.

(Pls.' Ex. 1007).

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 12**

25.     On June 2009, Plaintiffs purchased the Property from Wyckoff's estate, with the intention of building a new home and having a small farm and vineyard on the Property.  In purchasing the Property, Plaintiffs relied upon the information contained in the 1999 Property Status Report and the fact that building permits had been issued for neighboring properties.  (Old Republic Ex. No. 2007; Day 1 Tr. 221:3-6).

**D.     The Policy and the Underlying Access Dispute**

26.     On June 15, 2009, in conjunction with their purchase of the Property, Plaintiffs purchased a policy of title insurance – the Policy – from Old Republic, through its agent, Pioneer Title Company ("Pioneer"), in the amount of $157,900.  (Old Republic Ex. 2002).  Among the "Covered Risks" identified in the Policy are the following defects of title: (1) "Unmarketable Title," and (2) "No right of access to and from the Land."[8]  *Id.*

27.     On June 25, 2009, Plaintiffs submitted a building permit application for the Property.  (Day 1 Tr. 63:2-7; Pls. Ex. 1030).  Plaintiffs' application for a building permit was made in reliance upon their review of the Ada County zoning ordinance, as well as the 1999 Property Status Report.  (Old Republic Ex. No. 2007).

28.     On July 31, 2009, Jay Gibbons, Planning and Zoning Administrator for Ada County Development Services, informed Plaintiffs that, because of the Property's lack of access, a zoning certificate could not be issued and, thus, a building permit also could not be issued:

> . . . . Further, our analysis indicates that we cannot issue a zoning certificate for this parcel as it does not have access or frontage on a roadway defined as a public street or approved private road.

---

[8]  For purposes of this Memorandum Decision, Findings of Fact, and Conclusions of Law, the "Land" referenced in the Policy and the "Property" as used in this Decision are considered one and the same.

In order to rectify the current situation, thereby enabling Ada County to issue a zoning certificate, you will need to submit one of the following:

1.      Documentation that the Main Barnes Access Road has a recorded perpetual easement, a recorded maintenance agreement and an original approval from the entity that approved the road; <u>or</u>

2.      Gain approval for a private road.  This will require submittal of a private road application and all supporting documentation as per Ada County Code; <u>or</u>

3.      Obtain a letter from the Ada County Highway District stating that the Barnes Road is a public road.

You should also be aware that an approved private road will need to be improved as per Ada County Code due to the number of existing homes taking access from this road. Further, you will need an easement from the County for a portion of the road crossing property owned by Ada County.

(Pls. Ex. 1030).

29.     On August 14, 2009, Plaintiffs appealed Ada County's decision, hiring Spink

Butler, LLP to help address and resolve the access problems identified by Ada County

Development Services in its July 31, 2009 decision.  (Joint Ex. 6, Bates GUENTHER000150-55;

Day 1 Tr. 73:25-74:8).

30.     On December 7, 2009, in reference to the "Barnes Road," ACHD Staff Attorney

Scott Spears indicated in an e-mail that, among other things:

Title is clouded and arguably, ACHD has only been dedicated a small portion of right-of-way which is located north of the private bridge.  ACHD has never formally accepted the main Barnes Access Road as public right-of-way.  The Main Barnes Access road is a private road and ACHD takes absolutely no responsibility for it. . . . .

[A]s early as 1978, ACHD has advised several property owners along the Main Barnes Access Road that <u>before</u> ACHD will accept the portion of the Main Barnes Access Road as public right-of-way and declare it "open" for maintenance, it must be brought up to ACHD standards (including the bridge which would need to be rebuilt and widened). . . . .

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 14**

> [G]ranting the requested Access/Grading Permit for 8571 Main Barnes Access Road would be contrary to the position ACHD has consistently taken in the past as discussed above, and could be viewed as "acceptance" of the right-of-way and an "opening" of the road, albeit through the efforts of a private party working with ACHD's permission and on ACHD's behalf.

(Pls.' Ex. 1002, Bates GUENTHER001440) (emphasis in original).

31. On December 9, 2009, the Board of Ada County Commissioners issued the *first* "Findings of Fact, Conclusions of Law, and Order," denying Plaintiffs' appeal, finding in relevant part:

- Joseph and Lilian Barnes secured an easement across property owned by the Terteling Land Company in 1973, conditioned upon the improvement of the easement to Ada County Highway District minor rural road public street standards by December 31, 1977;

- In 1974, Joseph and Lilian Barnes recorded a deed of dedication describing a roadway easement for public street dedication;

- The 1974 deed of dedication describes the Barnes Main Access Roadway system;

- Since only an easement was acquired from the Terteling Land Company, a portion of the property included in the 1974 deed of dedication was not dedicated to the Ada County Highway District;

- The Barnes Main Access Road presently ranges from 10-15 feet wide and is currently improved with a sandy surface on the property that was owned by the Terteling Land Company;

- As it appears that the requirement to improve the access road was not met, the access easement across what was then the Terteling property reverted back to the property owner in accordance with the terms of the 1973 easement agreement;

- The subject property lacks deeded access to a public or private street;

- There appears to be no recorded easement granting the subject property access . . . .

(Pls. Ex. 1002).[9]

32.     On December 16, 2009, Plaintiffs tendered a claim on the Policy to Pioneer,

stating that Ada County, "along with ACHD made the determination that [the Road] is not legal

access and no other form of ingress/egress exists to our farm site." (Day 1 Tr. 77:10-17; Ex. 26

to Shaw Dep. (Docket No. 56, Att. 2)). Pioneer did not respond to Plaintiffs' claim; instead, it

forwarded the claim to Old Republic pursuant to the terms of its Agency Agreement, along with

several documents regarding Plaintiffs' claim. (Ex. 28 to Shaw Dep. (Docket No. 56, Att. 2)).

33.     On December 28, 2009, Mike Shaw, Old Republic's claims counsel assigned to

the matter, sent an email to Mr. Spears (ACHD Staff Attorney), stating:

> Mr. Spears: I enclose a copy of your email dated December 18, 2009 concerning the
> captioned matter along with a copy of a letter from Joe Guenther, our insured,
> notifying us of a potential title insurance claim. In response to Mr. Guenther's letter,
> our policy issuing agent in Boise, Pioneer Title Company, has sent me copies of
> deeds which I enclose for your information. Our agent believes these deeds establish
> legal access along Barnes Road to the land owned by Mr. Guenther and Ms. Ryerson.
> Also, I understand that other land owners near the Guenther/Ryerson land have
> obtained building permits and have in fact built houses on that land.
>
> I would appreciate it if you would review the attachments and let me know your
> position with regard to access along Barnes Road to the Guenther/Ryerson land. If
> you disagree that the documents I enclose with the attachments do not provide legal
> access please give me your reasons for such position.

(Joint Ex. 5, Ex. 55 therein).

34.     On December 30, 2009, Mr. Spears responded to Mr. Shaw's December 28, 2009

email, stating:

> Mr. Guenther and Ms. Ryerson do have access to their property via a private road,
> which is the legal status of the main Barnes Access Road ("Barnes Road"). ACHD

---

[9]  The appeal itself was also heard on December 9, 2009 and, at that time, Plaintiffs'
attorney, JoAnn Butler, argued that the 1999 Property Status Report was still valid. (Pls. Ex.
1002, Bates GUENTHER001310-18; Old Republic Ex. 2005).

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 16**

cannot grant an Access/Grading Permit to a private road. ACHD is unaware of the legal standard that defines "legal access" to which you refer. I assume that Ada County's Development Services required access to a public road. Barnes Road is not a public road.

The Joseph Barnes and Lilian Barnes Deeds of Dedication dated February 14, 1974, February 18, 1974,[10]and April 19, 1974[11] ("Dedication Deeds") for the Barnes Road did not turn Barnes Road into an open and accepted public right-of-way. Pursuant to Idaho Code § 40-202(2), ACHD may "hold title to an interest in real property for public right-of-way purposes without incurring an obligation to construct or maintain highway." ACHD has never accepted and opened the Barnes Road as a public right of way. The fact that the public or other land owners have used Barnes Road has not resulted in ACHD opening or accepting the road as an open public right-of-way. Specifically, Idaho Code § 40-202(2) provides that: "the mere use by the public shall not constitute an opening of the public right-of-way. In fact, ACHD does not have any duty to open and maintain the Barnes road. ACHD has never accepted or maintained Barnes Road as a public right-of-way and it continues to be private road.

In accordance with ACHD policy, ACHD may consider accepting and opening the dedicated portion of the Barnes Road upon completion of the following items:

1.     The roadway must meet ACHD radius requirements.

2.     There can be no conflict with existing structures.

3.     The legal description of the right-of-way must conform to the location of the roadway.

4.     The construction of the dedicated roadway must be built to ACHD roadway standards.

5.     The Bridge immediately north of Hill Road must be rebuilt, widened and constructed to ACHD standards.

6.     A permanent easement or license agreement granted to ACHD by the

---

[10]  The referenced February 18, 1974 Deed of Dedication (Instrument No. 875637) appears to be an attempt to dedicate what is commonly referred to as the Christianson Access Road the public. (Joint Ex. 5, Ex. 16 therein).

[11]  The referenced April 19,1974 Deed of Dedication (Instrument No. 882265) appears to be an attempt to dedicate what is commonly referred to as the Moore Access Road to the public. (Joint Ex. 5, Ex. 17 therein).

irrigation company to allow the encroachment of a bridge over the
canal facility.

(Joint Ex. 5, Ex. 55 therein).

35.     On January 5, 2010, Old Republic denied Plaintiffs' claim, saying that Plaintiffs
"have legal access to [their] land by way of a number of recorded instruments."  (Ex. 34 to Shaw
Dep. (Docket No. 56, Att. 3)).

36.     On January 8, 2010, Plaintiffs sent an email to Old Republic, asking Old Republic
to reconsider its denial of coverage.  (Ex. 35 to Shaw Dep. (Docket No. 56, Att. 3)).

37.     On January 12, 2010, Old Republic said no to Plaintiffs' request to reconsider,
stating that "[w]e find nothing that indicates you have been denied access to your land"; "it is
inconceivable that Ada County would deny you access to your land"; "it is our position that the
[P]olicy is correct in its insuring you access"; and "[i]f any person or entity seeks to deny you
access to your land, Old Republic Title will take such action as may be required under the policy
to establish insurable access."  *Id.*

38.     On January 22, 2010, Plaintiffs filed a Petition for Judicial Review and Complaint
in Idaho state court, essentially challenging Ada County's decision relating to the access issues
concerning the Property.  (Ex. 9 to Guenther Dep. (Docket No. 58, Att. 1).

39.     On March 21, 2011, Plaintiffs submitted a request for a zoning certificate for an
agricultural structure on the Property.  (Joint Ex. 5).

40.     On May 20, 2011, Richard Beck, Associate Planner for the Ada County
Development Services, issued the *second* "Findings of Fact, Conclusions of Law, and Order,"
denying Plaintiffs' submission, finding in relevant part:

- As shown in Instrument 834380[12] . . ., Joseph Barnes secured an access easement across property owned by the Terteling Land Company conditioned upon the improvement of the easement to Ada County Highway District minor rural road public street standards by December 31, 1977;

- On February 14, 1974, Joseph and Lillian Barnes recorded a deed of dedication under Instrument 874845, dedicating what is commonly referred to as the Main Barnes Access Road to the public without County Planning and Zoning Commission approval;

- The 1974 Deed of Dedication recorded under Instrument 874845, stated that the Grantors were the "owners in fee simple" of the property being dedicated even though at the time a portion of the property described in the instrument was still owned by the Terteling Land Company;

- As shown by warranty deed recorded under Instrument 887247,[13] the subject property was created on August 23, 1974 and did not individually exist in 1968;

- The warranty deed recorded under Instrument 887247 does not reference a permanent access easement;

- In 1984, Ada County purchased property from the Terteling Company as shown in Instrument 8449105, which included the property on which the Barnes access road exists. No mention of an easement for the road was included in the instrument;

- On January 22, 1986, the plat of Hidden Hollow Subdivision was recorded which included the property encumbered by the 1973 easement granted by the Terteling Land Company in instrument 8449105 [(the 1984 Warranty Deed)], and said plat did not identify an easement for the Main Barnes Access Road;

- On September 25, 1986, the Ada County Planning and Zoning Commission denied a request by Donald Moore to establish a private road on a portion of Main Barnes Access Road, because he did not possess the necessary perpetual easements needed to provide access to a public right-of-way across adjoining property;

---

[12] Instrument 834380 is the January 23, 1973 Grant of Easement from Terteling to Joseph B. Barnes.

[13] Instrument 887247 is the August 23, 1974 Warranty Deed in which the Barneses deeded the Property to Wyckoff.

- On July 28, 1988, the Board of Ada County Commissioners approved Quail Hollow Subdivision which included approval of Main Barnes Access Road as a private road;

- Record of Survey 1334, recorded on November 10, 1988, does not identify an easement for the Main Barnes Access Road;

- Record of Survey 1358, recorded on December 27, 1988, does not identify an easement for the Main Barnes Access Road;

- The Quail Hollow entitlement including the private road approval, expired on July 28, 1990; and

- In an email to Mr. Mike Shaw dated December 30, 2009, Ada County Highway District Legal Representative Scott Spears states that Main Barnes Access Road is not a public road and that the Ada County Highway District has never accepted or maintained the road.

(Joint Ex. 5).

41.     On or around August 3, 2011, Plaintiffs submitted an application requesting approval of a private road between Hill Road and the Property.  (Pls. Ex. 1000).

42.     On October 12, 2011, the Board of Ada County Commissioners issued the *third* "Findings of Fact, Conclusions of Law, and Order," conditionally approving Plaintiffs' application, finding in relevant part that, as to the Road:

- The Ada County Highway District has indicated in an email dated December 30, 2009, that the roadway is not a public road and that the District has never accepted or maintained the road;

- There is no record of any existing easement granting any other property owner right to cross the property owned by Ada County.

- In addition to securing any necessary easements from other private property owners, the applicant will be required to work with the Development Services Department and legal staff to secure an easement for the private road to cross the property owned by the County in Section 12.

(Pls. Ex. 1000).

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 20**

43.     On April 23, 2012, Plaintiffs filed this lawsuit in Idaho state court.  Old Republic

removed the action to this Court on May 15, 2012.  (Not. of Removal (Docket No. 1)).

44.     On July 10, 2012, in response to an email from Plaintiffs' counsel concerning

what was said by ACHD's Justin Lucas during the October 12, 2011 hearing,[14] ACHD's general

counsel, Steven Price, responded in relevant part:

> As you know, ACHD has been confused about the status of Barnes Access Road.
> Our GIS department has struggled in understanding the conflicting deeds and its
> status under Idaho law.  The legal department has recently provided them with some
> guidance in resolving the status of the road.
>
> Justin Lucas is in our planning department.  He doesn't have any detailed knowledge
> of the history of Barnes Access.  He is the weekly ACHD liaison to Ada County
> during their meetings.  As you know, a governmental entity can't be estopped by the
> actions or representations of their employees.  Justin was mistaken.  Based upon
> concerns of other staff . . . we conducted a review of this issue, including the title
> report to resolve the confusion.  I am happy to give you a copy.
>
> One thing is for certain – Barnes deeded the road.  ACHD holds legal title.  There
> has been no subsequent conveyance of the property.  At a minimum, ACHD accepted
> the Barnes Access Road as unopened public right-of-way when it adopted the first
> official map in 1998.  Moreover, there is nothing that prohibits ACHD from adopting
> a resolution that accepts Barnes Access Road as public right of way today.

(Old Republic Ex. No. 2011).

---

[14]  From Plaintiffs' counsel's email, Mr. Lucas apparently testified in relevant part that:

> The applicant actually . . . describes it very clearly, that this road was indeed
> dedicated to ACHD, but just because someone gives us something doesn't mean that
> we have to take it.  And that's what happened is Mr. Barnes tried to give ACHD –
> he dedicated it to the public.  But ACHD was not involved in that process
> whatsoever, and has never recognized that dedication.  So in essence this is not a
> public right-of-way owned or maintained by ACHD, and ACHD at this time has no
> plans to accept this as a public right-of-way. . . . .  Our only stance is that it is a
> private road, and we would view it as a private road in the sense that it's a private
> road – we don't have much to do with it.  That really falls to the county to decide
> whether you want to approve that private road or not.  Private road standards are
> your standards, they're not ACHD standards. . . . .

(Old Republic Ex. 2011).

45.    On October 9, 2012, a property transfer was made from Ada County to ACHD, transferring the strip of land containing the Road in the Northeast Quarter of Section 13 to ACHD; on October 10, 2012, a Resolution (Resolution No. 1066) was passed by ACHD Board of Commissioners to accept the property transfer from Ada County, stating in relevant part:

> A RESOLUTION RATIFYING AND AUTHORIZING THE EXECUTION OF A REAL PROPERTY TRANSFER AGREEMENT BETWEEN ADA COUNTY AND ACHD AND ACCEPTING A QUITCLAIM DEED FOR THE TRANSFER OF THE ADA COUNTY PROPERTY AS UNOPENED PUBLIC RIGHT-OF-WAY AND ACCEPTING AS UNOPENED PUBLIC RIGHT-OF-WAY CERTAIN RIGHT-OF-WAY PREVIOUSLY OFFERED TO THE PUBLIC BY DEDICATION BUT NOT FORMALLY ACCEPTED BY ACHD AS PUBLIC RIGHT-OF WAY. . . . .

> **WHEREAS**, in a Deed of Dedication recorded in the land records of Ada County as Instrument Number 874845, dated February 14, 1974, Joseph Barnes and Lillian Barnes dedicated certain right-of-way to the public for a portion of what is commonly known and referred to as the "Barnes Access Road" . . .; this offer of dedication . . . has never been formally accepted by ACHD however, in the time since this dedication, the public has traveled upon and otherwise used this right-of-way for access; and

> **WHEREAS**, in a Deed of Dedication recorded in the land records of Ada County as Instrument Number 875637, dated February 18, 1974, Joseph Barnes and Lillian Barnes dedicated certain right-of-way to the public for a portion of what is commonly known and referred to as the "Barnes Access Road" (also known as the "Christianson Access Road") . . .; this offer of dedication . . . has never been formally accepted by ACHD however, in the time since this dedication, the public has traveled upon and otherwise used this right-of-way for access; and

> **WHEREAS**, in a Deed of Dedication recorded in the land records of Ada County as Instrument Number 882265, dated April 19, 1974, Joseph Barnes and Lillian Barnes dedicated certain right-of-way to the public for a portion of what is commonly known and referred to as the "Barnes Access Road" (also known as the "Moore Access road") . . .; this offer of dedication . . . has never been formally accepted by ACHD however, in the time since this dedication, the public has traveled upon and otherwise used this right-of-way for access; and

> **WHEREAS**, in a Deed of Dedication recorded in the land records of Ada County as Instrument Number 7531016, dated October 10, 1975, Joseph Barnes and Lillian Barnes dedicated certain right-of-way to the public for a portion of what is

commonly known and referred to as the "Barnes Access Road" (also known as the "Barnes-Browning Access Road") . . .; this offer of dedication . . . has never been formally accepted by ACHD however, in the time since this dedication, the public has traveled upon and otherwise used a significant portion of this right-of-way for access; and . . . .

**BE IT FURTHER RESOLVED**, that pursuant to section 67-2323 of the Idaho Code, the Ada County Highway District Board of Commissioners hereby finds that it is in the public interest for Ada County Highway District to accept, and does hereby accept the Quitclaim Deed executed by County transferring County property to District . . .; and

**BE IT FURTHER RESOLVED**, that pursuant to section 40-202(2) of the Idaho Code, the Ada County Highway District Board of Commissioners accepts the County property as unopened public right-of-way and hereby declares it to be unopened public right-of-way and directs the official map of the highway district to be amended accordingly; and

**BE IT FURTHER RESOLVED**, that pursuant to section 40-202(2) of the Idaho Code, and notwithstanding the prior use by the public of the rights-of-way previously dedicated to the public in Instruments 874845, 875637, 882265, and 7531016 referenced above, the Ada County Highway District Board of Commissioners hereby accepts the aforementioned dedications and the rights-of-way described therein as unopened public right-of-way and hereby declares it to be unopened public right-of-way and directs the official map of the highway district to be amended accordingly.

(Joint Ex. 7) (emphases in original).

## III. <u>DISCUSSION</u>[15]

The Court has considered the parties' briefing and the trial evidence against the four issues stipulated for resolution during this portion of the bifurcated trial. The record from which the Court's decision will be drawn is a patchwork of evidence – including government records, direct testimony, maps, and photographs – loosely tracing the history of the Road and its use over the course of nearly 40 years – with interlocking pieces in some instances, and missing

---

[15] To the extent any of the facts or conclusions stated in this Section can be considered Findings of Fact and/or Conclusions of Law and are not restated in Sections II or IV, they are incorporated by reference into these relevant Section(s).

parts in others. With this in mind, the Court now addresses the stipulated issues in order to determine whether Plaintiffs had legal access to their Property as of June 15, 2009.

A.   **Issue No. 1**: **Whether the Road was Improved as Required by the 1973 Grant of Easement Between Terteling and Joseph Barnes**[16]

The first chapter in this tangled web of a dispute began innocuously enough in a simple contract made on January 23, 1973, in which Terteling granted to Joseph Barnes an easement to access the Property via the Road. The Grant of Easement contained this relevant, and potentially dispositive, language:

> Provided, however, that if [Barnes] shall not by December 31, 1977, have improved said right of way to the standards of a "Minor Rural Road" as specified by the Ada County Highway District, to wit, a 24 foot road bed surfaced with 7 inches of 2-inch crushed gravel, compacted, topped by 3 inches of 3/4-inch crushed gravel, compacted, and with normal borrow pit sections on each side, then on that date said easement or right of way shall revert to the then owner of the servient tenement.

(Joint Ex. 1). Hence, if the improvements were completed by December 31, 1977, an easement was cemented (the argument goes) as of June 15, 2009, thus providing Plaintiffs with legal access to their Property and, therefore, no coverage under the Policy. Plaintiffs argue that the improvements were never completed (otherwise, they'd never be here in the first place). Old Republic counters that Plaintiffs cannot meet its burden on this point.

_____

[16] At the outset, Old Republic asserts that, because Plaintiffs previously argued that they did have legal access to the Property, they should now be judicially estopped from claiming here that they did not have legal access to the Property. *See* Old Republic's Proposed FOF/COL, p. 21, n.106 (Docket No. 160). This argument is without merit. One of the factors involved with determining whether to apply the doctrine of judicial estoppel is "whether the party achieved success in the prior proceeding since 'judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.'" *United Steelworkers of America v. Retirement Income Plan for Hourly-Rated Employees of Asarco, Inc.*, 512 F.3d 555, 563 (9th Cir. 2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). Plaintiffs did not succeed in previously arguing that they had legal access to the Property.

There is nothing in the record which is directly dispositive of this question, such as a written communication between the Barneses and Terteling about the fact of the improvements having been made, or acknowledged to have been made. Instead, the evidence concerning whether the Road was improved as required by the Grant of Easement is both sparse, at best, and sometimes only indirectly relevant upon the ultimate issue.

For example, aerial photographs taken during the relevant time period (1972, 1974, 1975, 1976, and 1978), were admitted into evidence to illustrate changes (or non-changes) in the appearance of the road from the air. Such photographs do contain some changes in appearance of the width or contour of the road in locations, but otherwise do not (and presumably could not) reflect the composition of the road, nor the dimensions or depths of any road materials. Even the changes in width, where such changes can be identified, are ultimately nothing more than drifting pieces of evidence because they have no contextual mooring to actual dimensions on the ground. (Pls.' Exs. 1021-27). Plaintiffs acknowledge that "there is evidence of some roadway construction in the 1978 aerial photograph," but argue that, even if true, such evidence is not outright proof of (1) the specific improvements called for in the Grant of Easement, that (2) existed as of the December 31, 1977 deadline regardless. The Court agrees. The aerial photographs allow possible inferences that could be drawn of something having changed on the road over the period during which they were taken, but the inferences fall short of more-probable-than-not evidence of the actual improvements required by the terms of the Grant of Easement. It is simply impossible to tell from these photographs; in short, they raise as many questions as they answer.

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 25**

Witness testimony is similarly lacking in persuasiveness as to whether certain improvements were made by a certain date, and, in some instances, the witness testimony strongly inferred that such improvements had never been made.  For example:

- J.R. King purchased property at the beginning of the Road (before the portion of the Road containing the disputed Easement) in March 1977 (moving onto that property in December 1978) and also purchased property abutting the disputed Easement in 1989.  Mr. King testified as to the disputed portion of the Road in 1977 that he (1) did not recall it being 24-feet wide its entire length (Day 1 Tr. 291:11-15; 300:4-302:14); (2) did not recall seeing either 3/4-inch or 2-inch crushed gravel (*id*. at 292:13-21; 306:6-307:1); and (6) did not recall borrow pits on both sides of its entire length (*id*. at 289:17-290:6;305:1-13).[17]  However, Mr. King also admitted that he "didn't have much business" going up to the alleged Easement portion of the Road prior to 1989 (*id*. at 318:11-319:7), while being altogether unaware of the Road's condition between 1973 and 1976, during which time improvements could have been made (*id*. at 313:13-23).

- Ruth Browning lives at the end of the Road and has continuously accessed her home using the Road since 1973.  She recalls the Road being improved during the 1970's, but had no personal knowledge of what improvements were supposed to have been made pursuant to the Grant of Easement; no recollection of what improvements were actually made; nor whether any such improvements took place before December 31, 1977.  (Day 2 Tr. 22:11-25:25).

- Flinda Terteling is Terteling's current president.  She testified that, upon searching the company records, she "didn't find anything" regarding documentation relating to the alleged Easement and, additionally, "ha[d] no knowledge" of whether Terteling considered any easement to be terminated.  (Day 2 Tr. 28:8-25).[18]  Ms. Terteling went on to testify, however, that it was

---

[17]  As pointed out by Old Republic's counsel during cross-examination, Mr. King previously testified during his deposition that he did not recall the condition of the Road in 1977.  (Day 2 Tr. 314:5-25).  But, while on the stand, Mr. King pointed out that he said in his deposition that "[i]t was like a sand track" (*id*. at 315:1-9) before reiterating during cross-examination that he did recall the condition of the Road in 1977 (*id*. at 315:10-14).

[18]  Old Republic construes this testimony to mean that Ms. Terteling found no evidence that any easement to the Property had been terminated.  *See* Old Republic's Proposed FOF/COL, p. 6 (Docket No. 160) (citing Day 2 Tr. 27:13-28:25)).  But even if that is the case, Ms.

Terteling's "usual practice" to review title policies and that, "[i]f there were things that were going to impact [Terteling's] ownership of [property] or our sale [of property], we would have those things cleaned up before closing." (*Id*. at 36:14-37:1).[19]

- Randy Noble is a recently-retired ACHD employee. He testified that, while a laborer/equipment operator with ACHD, he had the occasion to perform repair work (primarily grading) on the Road two different times in the 1980's. During those times, Mr. Noble observed that the easement portion of the Road (1) was at least 20 feet wide, (2) had remnants of both 3/4-inch and 2-inch crushed gravel, and (3) had borrow pits that had to be re-cut as was necessary to avoid being silted in following storm runoffs. (Day 2 Tr. 125:6-132:6). Except, again, such testimony does not shed any light on the issue of whether any improvements to the Road took place before December 31, 1977 as required by the Grant of Easement and, even if so, the extent of those improvements. Mr. Noble testified in no uncertain terms that he had no opinion as to whether the Road improvements required by the Grant of Easement were made prior to December 31, 1977. (*Id*. at 135:14-136:11).

No other witnesses offered relevant testimony regarding the condition of the Road (and whether the called-for improvements had been made) between 1973 and 1977.[20] It is not

_____

Terteling's testimony on that subject does not establish that the conditions for the easement to remain were satisfied according to Grant of Easement's terms. There is no compelling inference to be drawn from such testimony in favor of either party. For instance, absent an easement to begin with (at least as of January 1, 1978), there would be no record of such a non-existent easement terminating.

[19] This implicates the October 2, 1984 title policy, listing the Easement as an exception as of 1984 (Old Republic Ex. 2001). According to Old Republic, Terteling never objected to the Easement being listed as an exception in the 1984 title policy, suggesting that improvements must have been made before the end of 1977 to establish the Easement. But that argument cannot be reached even inferentially from Ms. Terteling's testimony. As she acknowledged at trial, in her role as an administrative assistant in the company's offices in 1984, she did not herself scrutinize the 1984 title policy. Rather, as a general rule at that time, Terteling's attorney reviewed the title policy, and she did not know what, in fact, the attorney reviewed. (Day 2 Tr. 37:23-38:6). Nor, for that matter, could she have known whether the fact of such an exception impacted Terteling's ownership, or needed to be "cleaned up."

[20] Mr. Guenther himself opined that "[t]he physical evidence remains today that there was nothing placed on that [R]oad," implying that, based upon the Road's current condition, the terms of the Grant of Easement were not met. (Day 1 Tr. 210:12-211:12). However, in attempting to secure a building permit for the Property, Mr. Guenther had previously argued that

surprising that the available evidence on this subject, for that time period, is hard to come by. Of

what is available, there is insufficient relevant evidence to persuade the Court that the required

improvements were made during the period between January 1973 and December 1977. In that

regard, the Court has focused upon the following evidence:

Mr. King, although not in the vicinity until 1977 and 1978, does not remember seeing a

right-of-way 24 feet in width, does not recall crushed gravel, and does not recall borrow pits

along the roadway.

Mrs. Browning, understandably, does not have a precise memory of that particular

decade, and what she was able to remember was imprecise – *e.g.*, she remembers a large-scale

construction project in the 1970's, but not what was specifically done or whether it was done

before December 31, 1977.

Ms. Terteling made a search of Terteling's records and could find nothing related to any

alleged easement. She says that it was Terteling's practice to "clean-up any problems" presented

by exceptions to a title policy connected to a sale of company real estate. Yet, there was nothing

in the records at all about the Grant of Easement/Easement, despite the fact that it was mentioned

as a special exception in the title policy issued in September 1984 in regard to Terteling's

conveyance to Ada County of the real property in Section 13 where the Road is located.[21] Then,

_____

it was impossible for Ada County to determine whether any improvements to the Road were ever
made. (*Id*. at 228:17-20). Therefore, the Court lends little weight to Mr. Guenther's opinions
(formed many years removed from the 1973-1977 time frame, and evolved in the crucible of his
unfolding legal situation). Indeed, Plaintiffs do not submit his opinion/testimony as supporting a
finding of fact/conclusion of law on this issue. *See generally* Pls.' Proposed FOF/COL (Docket
No. 159).

[21] The Court acknowledges that there is room to argue, as Old Republic does, that this
exception infers that the Road *was* improved as required by the Grant of Easement. But that

less than two years later, on January 22, 1986, Terteling caused to be recorded the official plat of the Hidden Hollow Subdivision. The plat identified certain easement rights, but not any easement rights reflective of the Grant of Easement. The most sensible inference to be drawn from those details is not that Terteling acknowledged the Easement, but rather that Terteling did *not* acknowledge the Easement.

It is hardly surprising that witness testimony of attenuated information, or entirely lacking first-hand knowledge on matters four decades old, is less-than-precise or even persuasively helpful on these issues. Further, while it might have been helpful to have expert testimony discussing the roadway engineering "ins and outs" of what the Road's improvements (had they been accomplished sometime between 1973 and 1977) might have looked like years later compared against what actually exists today, its absence is not fatal to Plaintiffs' claim when considering, again, the paucity of evidence speaking to any improvements made to meet the Grant of Easement's conditions in both scope and time.[22] What is known, though, is that, with the exception of the October 2, 1984 title policy and corresponding title commitments, no easement accessing the Property using the Road was ever recognized, despite the many opportunities to do so over the course of many years.

At most, what can be gleaned from the record is that, while certain improvements to the Road *may* have taken place between 1973 and 1977, there is no ultimately persuasive evidence

---

inference is bare of corroboration and lacks any underlying factual support. The exception appears to this Court to be a typical artifact of a title company plant, placed into a policy for completeness, but without any examination into the bona fides of the recorded easement apart from its appearance in the public record. The more compelling inference is that which comes later, when Terteling omits any reference to the easement in its Hidden Hollow Subdivision plat.

[22] Naturally, had there been persuasive evidence of the necessary improvements taking place between 1973 and 1977, the omission of such expert testimony may have proved problematic for Plaintiffs. But that is not the case; at least not on this record.

of improvements *actually* taking place during this exact time, in the manner specified by the Grant of Easement. There is evidence of something having been done, but the testimonial and documentary evidence does not support a conclusion that the conditions of Grant of Easement were satisfied. Stated in the converse, on this issue, Plaintiffs have met the burden of proving that the Grant of Easement's conditions were not satisfied.

**B.**     **Issue No. 2: Whether the Easement's Reversionary Clause Was Self-Implementing or Subject to a Right of Re-Entry**

In the alternative, Old Republic contends that, even if the improvements to the Road were not made in accordance with the Grant of Easement, the easement rights continued unaffected because no one ever took any affirmative action to terminate the Easement. In essence, Old Republic argues that the Easement did not automatically revert to Terteling as of December 31, 1977 but, instead, was subject only to a right of re-entry and neither Ada County nor its predecessor-in-interest took the necessary steps to terminate the Easement.

For this position, Old Republic relies upon Idaho Code § 55-608.[23] Enacted in 1887, Idaho Code § 55-608 states:

> Where a grant is made upon condition subsequent, and is subsequently defeated by the nonperformance of the condition, the person otherwise entitled to hold under the grant must reconvey the property to the grantor or his successors, by grant duly acknowledged for record.

_____

[23] At various points in this litigation, Old Republic has argued that the Grant of Easement's reference to the completion of particular improvements by a date certain represents a conveyance of land in fee simple subject to a condition subsequent, with a right of re-entry. *See, e.g.*, Old Republic's Mem. in Supp. of MSJ, pp. 6-7 (Docket No. 53, Att. 1); Old Republic's Trial Br., pp. 9-12 (Docket No. 100) (citing Restatement (First) of Property § 45 cmt. m (1936) (updated 2014)). However, Old Republic's Proposed Findings of Fact and Conclusions of Law appear to move away from such an argument, in favor of Idaho Code § 55-608's application. *See* Old Republic's Proposed FOF/COL, pp. 21-25 (Docket No. 160). Still, such a transition is not wholesale in nature as it calls upon similar theories to prevail. *See infra.*

I.C. § 55-608. Chapter 6, Title 55, Idaho Code, applies to "Transfer[s] of Real Property." An easement – while no-doubt an interest in real property – is not the same as a transfer of real property; it simply creates a "'right to use the land of another for a specific purpose that is not inconsistent with the general use of the property of the owner.'" *Beckstead v. Price*, 190 P.3d 876, 881 (Idaho 2008) (quoting *Luce v. Marble*, 127 P.3d 167, 176 (Idaho 2005)).[24, 25] An easement is more akin to a servitude than an estate in fee simple (the latter of which unquestionably is subject to Idaho Code § 55-608). In discussing the termination of *servitudes*, the Restatement (Third) of Property provides that, "[i]f the terms of the servitude include an express expiration date or provide for termination on the occurrence of a condition, the terms will be given effect . . . ." Restatement (Third) of Property § 7.2 cmt. a (2000) (updated 2014); *see also id*. at § 4.1 ("A servitude should be interpreted to give effect to the intention of the

---

[24] The surrounding Code sections largely (but not completely (*see infra*)) support this conclusion as they refer to "[a] conveyance of an estate in real property" (I.C. § 55-601), "transferring an estate in real property" (I.C. § 55-602), a "grant of real property" versus a grant of "a lesser estate" (I.C. § 55-604), a "grant [of] real property in fee simple" (I.C. § 55-605), a "grant or conveyance of an estate in real property" (I.C. § 55-606), "a grant . . . of an estate for life or years" (I.C. § 55-607), a "transfer of land" (I.C. § 55-611), and a "conveyance by which an estate of inheritance, possessory right, or fee simple" (I.C. § 55-612). *But see* I.C. § 55-615 (discussing easements for the purpose of exposure of solar energy device to sunlight). Although Idaho Code § 55-603 speaks to easements, it merely provides that, when real property is transferred, easements attached thereto pass as well. *See* I.C. § 55-615; *see also* I.C. § 55-615(3) (same with respect to solar easements).

[25] The argument advanced by Old Republic that Idaho Code § 9-503 proves that easements represent transfers of property is putting the proverbial square peg in a round hole. *See* Old Republic's Proposed FOF/COL, p. 22 (Docket No. 160). That section deals with the statute of frauds and the need for (as the section title specifies) "transfers of real property to be in writing." I.C. § 9-503. Further, "no estate *or interest in real property* . . ." can be created/granted unless by operation of law or by instrument in writing. *Id*. (emphasis added). The fact that an easement represents an "interest in real property" does not mean that all interests in real property amount to a transfer of real property as Old Republic posits – rather, only that easements (like other interests in real property) must comply with Idaho's statute of frauds.

parties ascertained from the language used in the instrument, or the circumstances surrounding

creation of the servitude, and to carry out the purpose for which it was created.");[26] 25 Am. Jur.

2D *Easements and Licenses in Real Property* § 17 (2014) ("The general rules that apply to the

construction of writings apply to the construction of grants of easements. . . . .  If the language

[by which an easement purportedly is granted] is clear and explicit, extraneous circumstances

ordinarily may not be resorted to, nor may parol evidence be admitted to, vary the terms of the

instrument."); *id*. at § 82 (" . . . an easement may be created which will terminate on the

occurrence of a specified event or contingency or which may be terminated on the occurrence,

breach, or nonperformance of a condition."); *id*. at § 83 ("The written terms of the grant of an

easement ordinarily will determine the manner of its termination and the events which may cause

it."); *id*. at § 84 ("Where an easement has been created until the happening of a specific event or

contingency, the easement will terminate *ipso facto* on the happening of the specified event or

contingency.")

   The Grant of Easement provides that, if certain improvements are not made to the Road

by December 31, 1977, the Easement automatically reverts back to the servient estate on that

date.  *See* (Joint Ex. 1) (". . . *if* Grantee *shall not* by December 31, 1977, have improved said

---

[26]  Idaho courts will not adopt a Restatement provision if it is inconsistent with Idaho precedent, a different formulation resolved the issue, or the issue can be resolved by current Idaho law.  *See Dennett v. Kuenzli*, 936 P.2d 219, 226 (Idaho Ct. App. 1997).  Hence, it is significant that the Court is not aware of any law in Idaho (and the parties have not provided any) that is inconsistent with these pertinent sections of the Restatement (Third) of Property. *Compare with generally Wellberg Invs., LLC v. Greener Hills Subdivision*, 2014 WL 4638703, *2 (Utah App. 2014) ("To interpret easements, we apply the same rules of construction used in interpreting contracts."); *Haworth v. U.S.*, 461 Fed. Appx. 739, 745 (10th Cir. 2012) ("In Wyoming, "[e]asements are [interpreted] under the same principles that have been established for interpretation of contracts.") (internal quotations omitted); *Watson v. Dundas*, 136 P.3d 973, 977 (Mont. 2006) ("General principles of contract law apply in interpreting an easement by grant.").

right of way . . ., then *on that date* said easement . . . *shall revert* to the then owner of the servient tenement.") (emphasis added). It follows, then (and consistent with basic principles of contract law), that because the improvements to the Road were not made by December 31, 1977 (*see supra*), the Easement automatically reverted back to Terteling – unaffected in that context by Idaho Code § 55-608.[27] Old Republic has not met its burden on this issue.

---

[27] On the surface, Plaintiffs' additional argument that Idaho Code § 55-608 cannot be read to create a right of re-entry may seem to have some strength. *See* Pls.' Proposed FOF/COL, p. 16 (Docket No. 159). According to Plaintiffs, Idaho Code § 55-608 cannot be read to mean that, when certain conditions attendant to the ongoing viability of an easement are not met, the easement continues in perpetuity until the grantee reconveys it back to the grantor. Plaintiffs contend that, not only does such an interpretation conflict with Idaho Code § 55-608's express terms that the "grant is defeated by the nonperformance of the condition," it places an unstated duty/burden upon the grantor to secure a reconveyance from a breaching party or take some affirmative action to quiet title (lest the grantor risk forfeiting the involved property). *Id.* (citing I.C. § 73-113(1) ("The language of a statute should be given its plain, usual and ordinary meaning. Where a statute is clear and unambiguous, the expressed intent of the legislature shall be given effect without engaging in statutory construction. The literal words of a statute are the best guide to determining legislative intent.")). However, even though Idaho has no case law considering Idaho Code § 55-608, other jurisdictions – California (Cal. Civ. Code § 1109), Guam (21 G.C. § 4206), and South Dakota (S.D. § 43-25-18) – have enacted nearly-identical statutes, with California (neither Guam nor South Dakota have case law dealing with their respective statutes) recognizing a grantor's right of re-entry upon a defeated condition. *See, e.g.*, 30 Cal. Jur. 3d *Estates* § 40 (2014) ("The effect of [Cal. Civ. Code § 1109] is to permit the owner of the power of termination to bring an action to enforce the statutory right to a conveyance . . . ."; *Firth v. Los Angeles Pacific Land Co.*, 152 P.935, 404-05 (Cal. App. 2 Dist. 1915) (considering Cal. Civ. Code § 1109, stating: "The act of re-entering was one mode by which a determination of the grantor to take advantage of the condition broken might be manifested. It would also be well manifested by the bringing of an action to have declared the estate of the grantee terminated."); *Parsons v. Smilie*, 23 P. 702, 705 (Cal. 1893) (finding that, under Cal. Civ. Code § 1109, grantor, on entry for breach of condition in recorded deed, may sue to compel reconveyance, as record of deed shows legal title to be in grantee notwithstanding entry). In other words, assuming Idaho Code § 55-608 applies to grants of easements (and this Court determines here that it does not (*see supra*)), whether it goes on to allow for a grantor's right of re-entry, or, simply, results in an automatic termination of the easement without further conduct from either the grantor or grantee, is not as straightforward as Plaintiffs suggest. *Contra* Old Republic's Proposed FOF/COL, pp. 23-25 (Docket No. 160) ("Something further must be done. Any other interpretation would render the reconveyance language in I.C. § 55-608 meaningless, and would also be contrary to public policy."). At the very least, California case law on a virtually identical statute appears to allow for the prospect of a grantor's right to re-

**C.      Issue No. 3: If the Easement was Subject to a Right of Re-Entry, Whether the Requisite Action was Taken to Terminate the Easement**

The Easement terminated on December 31, 1977, as it was not subject to a right of re-entry (*see supra*).  Thus, whether the necessary step was taken to terminate the Easement is moot. **D.      Issue No. 4: If the Easement Terminated, Whether Legal Access Existed by Virtue of the Alternative Access Theories**

This Court previously ruled as a matter of law that the Policy "provides coverage in instances where no right of access – *legal* access – exists to and from the Property."  9/26/13 MDO, p. 18 (Docket No. 81) (emphasis in original).  However, whether legal access to and from the Property existed as of June 15, 2009 remained an unsettled question before this Court – one that was ultimately tried during the first portion of the bifurcated trial.  To that end, Old Republic advanced different arguments – the "alternative access theories" – that, if accepted, would establish the requisite legal access (independent of the Grant of Easement) and, thus, preclude coverage under the Policy.  The alternative access theories include: (1) Idaho Code § 40-202/public right-of-way; (2) quasi-estoppel/permissive use; and (3) easement by prescription.

1.      Idaho Code § 40-202/Public Right-of-Way

There are specific ways by which a public highway may be created in Idaho.  *See* I.C. § 40-202.  Pertinent here, Old Republic argues that the Road became a public right-of-way pursuant to Idaho Code § 40-202(3), which provides:

> Highways laid out, recorded and opened as described in subsection (2) of this section, by order of a board of commissioners, and all highways used for a period of five (5) years, provided they shall have been worked and kept up at the expense of the public, or located and recorded by order of a board of commissioners, are highways. . . . .

---

enter upon the failure of an understood condition.

I.C. § 40-202(3). Old Republic argues that, consistent with Idaho Code § 40-202(3), the Road

became a public right-of-way because (1) it has been used continuously by the public since the

1970's, and (2) it was located and recorded on Ada County's Official Map in 1998.[28]

Section 40-402 has been a source of frequent litigation in Idaho courts, and a number of

reported decisions discuss the burden placed by Idaho law upon those who would argue that a

roadway is a public roadway. "Idaho Code § 40-402 may be used by counties or by private

parties to obtain a declaration that a road is a public highway . . . . The primary factual questions

are the frequency, nature and quality of the public's use and maintenance." *Burrup v. Stanger*,

753 P.2d 261, 264 (Idaho Ct. App. 1988) (quoting *Tomchak v. Walker*, 700 P.2d 68 (Idaho

1985)).

---

[28] Old Republic appears to concede that (1) Idaho Code § 42-202(2) does not apply given the legitimate issues surrounding both the Barneses' ability to dedicate certain property along with Ada County's historical (non)acceptance of any such dedications, and (2) there is no/insufficient evidence that, even with the public's alleged use of the Road for at least five years, it was not "worked and kept up at the expense of the public":

> Plaintiffs argue Idaho Code § 40-202(3) should not apply because Barnes did not have the authority to grant the Deed of Dedication over Ada County's portion of the Road; *i.e.*, that ACHD could not have acquired an interest in the Ada County portion of the Road because Barnes did not own that portion of the Road. That argument is misplaced because it relies on the requirements of Idaho Code § 40-202(2) instead of Idaho Code § 40-202(3). Idaho Code § 40-202(2) is the straight-forward dedication process that requires the highway district to first acquire an interest in the subject real property through a deed of dedication. Idaho Code § 42-202(3) expressly provides two alternatives to the straight-forward dedication/acquisition process set forth in Idaho Code § 40-202(2): (1) use for five years, plus public maintenance; or (2) use for five years, plus placing the road on a map by order of the respective highway district board of commissioners. Thus, even if the Road was not properly dedicated, it still became a right-of-way in 1998, pursuant to Idaho Code § 40-203(3), when it was located and recorded on ACHD's Official Map.

Old Republic's Proposed FOF/COL, p. 26 (Docket No. 160); *see also* (Day 2 Tr. 200:24-201:6).

In this case, if one assumes that the Road was properly recorded on the ACHD Official Map (a fact not decided here, and strongly contested by Plaintiffs, (*see* discussion *infra*)) the pivotal issue is whether there was sufficient public use of the road for a period of at least five years. "The public's use of the road must have been more than only casual and desultory." *Id.*, citing *Kirk v. Schultz*, 119 P.2d 266 (1941). The facts must show "that the public has used the road regularly, as it would any similar public highway," and "the public's use of the road was not merely the result of permission given by the owner, as opposed to acquiescence of the owner." *Id. Accord Lattin v. Adams County*, 236 P.3d 1257, 1262 (Idaho 2010) ("casual or sporadic use is not enough – the use must be regular and continuous"). Similarly, there must be "regular or customary use by the public." *Roberts v. Swim*, 784 P.2d 339, 346 (Idaho Ct. App. 1989). Significantly, such use must be "extensive." *Ada County Highway Dist. v. Total Success Invs. LLC*, 179 P.3d 323, 328 (Idaho 2008) ("public status of the roadway can be established by proof of regular maintenance and extensive public use") (citing *Floyd v. Bd. of Comm. of Bonneville County*, 52 P.3d 863, 869 (Idaho 2002)).

In this case, Old Republic argues that there is sufficient evidence of public use for a period of five years. The trial record contains a pockmarked array of evidence as to use. There was testimony that certain adjoining landowners used the Road to get to and from their homes. This includes Edna Wyckoff, from whose estate Plaintiffs purchased their property, who used the Road on a daily basis from 1974 until sometime around 2007. Ruth Browning did the same, from 1973 until the present, and her family members and friends also used the road to reach her home.

Mrs. Browning said that Idaho Power would send a meter reader up to read her electric meter and her neighbors' meters until a few years ago, when the company switched to meters

that could be monitored remotely. Mr. King, who has lived at the intersection of Hill Road and the Road since the late 1970's, said that his wife and kids have walked up the road, that he sees his neighbors using the road, and that he sees a few joggers and a few horseback riders. But generally, Mr. King said that use of the road by non-landowners was limited: "I don't know why the general public would go up there," Mr. King said. "It's a dead end road . . . . there's several cars I recognize as being offspring of the neighbors, but I don't think the general public uses the road much."[29] (Day 1 Tr. 335:6-336:15).

The evidence relied upon by Old Republic is attenuated and thin, especially when compared to cases in which the Idaho appellate courts have upheld trial court decisions recognizing public roads. In summary, the evidence is that the handful of landowners who lived along the Road used the Road to get to and from their homes, that relatives and their friends used the Road for the same purpose, that the electric utility meter reader used the road to read the electric meters, and that an occasional jogger or horseback rider would travel up the road. Otherwise, to repeat what Mr. King said from his many years living next to the road, "I don't know why the general public would go up there."

---

[29] There is some suggestion in the record that Old Republic would also rely upon the presence of Ada County Highway District road maintenance equipment on the Road as evidence of public use. Such an argument is misplaced. There was only one isolated incident of such equipment coming to the Road to work on what were essentially road repairs necessitated by a bad storm. Mr. Noble, who drove his road grader to do the work that day, testified that there had been a "pretty good storm," and the ACHD maintenance manager took a call from someone who asked for help on the road. Mr. Noble said he was asked to go up there and "not spend much time there, but help as much as I could and get out of there." Noble also testified that in his long, multi-decade, career with the agency, ACHD had never maintained the Road. In the Court's view, this evidence would be relevant (but not persuasive) if Old Republic were contending that there had been five years of maintenance on the Road paid for by public funds. Old Republic is not making that argument. Hence, the evidence simply indicates that there was gratuitous work done by ACHD, but that is evidence related to maintenance issues, not to public use. *See, e.g., Rice v. Miniver*, 739 P.2d 368, 369 (Idaho 1987).

Old Republic contends that such evidence is sufficient, arguing that "the Road has been used continuously by the public since the 1970's," and relying upon the holding in *Ada County Highway Dist. v. Total Success Invs., LLC*, 179 P.3d 323, 330-331 (Idaho 2008). That decision does discuss evidence of adjacent landowner use, but its emphasis is upon "use of a roadway by *adjoining landowners' invitees and guests . . .*," which, the Idaho Supreme Court acknowledges is a proper piece of the evidence to be considered. *Id.* However, there is no holding that evidence limited to use by adjoining landowners (or evidence limited to use by adjoining landowners, their invitees, and guests), requires a finding that sufficient public use is present. To the contrary, such use (if that is all there is) must still meet all of the touchstones that Idaho law requires – it cannot be casual, it cannot be desultory, it must be regular, it must be extensive, and it must last a period of five years.

On this record, those thresholds are not met. The only evidence of public use in the record *other* than the use of the Road by the adjoining landowners are the occasional vehicle trips made by relatives and friends (and there is no detail as to how many and how often), the utility meter reader (who, the Court will take notice, would have made a monthly visit), and the infrequent jogger or horseback rider.

Such use is far closer to "casual and desultory" than not, and does not support a finding of public use. *Kirk v. Schultz*, 119 P.2d 266 (1941). Further, there is insufficient evidence "that the public has used the road regularly, as it would any similar public highway" even as to the adjoining landowners and guests. *See Lattin v. Adams County*, 236 P.3d 1257, 1262 (Idaho 2010) ("casual or sporadic use is not enough – the use must be regular and continuous"); *Roberts v. Swim*, 784 P.2d 339, 346 (Idaho Ct. App. 1989).

Perhaps most importantly, the evidence of use – even including the use of the Road by the adjoining landowners' guests and invitees – simply cannot, under any sensible assessment, be considered "extensive." *Total Success*, 179 P.3d at 328 ("public status of the roadway can be established by proof of regular maintenance and extensive public use,") citing *Floyd v. Bd. of Comm. of Bonneville County*, 52 P.3d 863, 869 (Idaho 2002). The Road is hidden in the foothills, is not a thoroughfare, has only a handful of adjoining landowners, contains no business operations, and is a place where, by all appearances, one is more likely to hear the howl of a coyote than the sound of a car. The nature of the use is starkly different than the use considered by the Idaho Supreme Court in *Total Success*, where the road at issue was regularly used by sewer system employees to access manholes, and by multiple different suppliers, service people, vendors, and customers to access adjacent businesses on a daily or weekly basis. *Id.,*179 P.3d at 366-367.

There is a difference between *any* use and *extensive* use. Here, there is not persuasive evidence of extensive use for a period of five years. Rather, the evidence is much more of the nature found in the cases where the Idaho Supreme Court has ruled against the existence of a public roadway. *E.g.*, *Lattin*, 236 P.3d 1257, 502,503 (Idaho 2010) (notwithstanding affidavit evidence from three residents attesting to use of contested roadway for at least 20 years by local residents to access adjoining national forest for various recreational or personal activities, and occasional use of roadway by construction equipment, there was insufficient evidence that such use "occurred frequently, or with any consistency, especially over a five-year span" and therefore there was "insufficient evidence" of "sufficient public use of the road"); *Aztec Ltd., Inc. v. Creekside Inv. Co.*, 602 P.2d 64, 66 (Idaho 1979) (use of roadway by three or four

homeowners, their visitors, and invitees might constitute private easement, but is insufficient to establish public use for five-year period required to establish public road under Idaho law); *Roberts v. Swim*, 784 P.2d 339, 346 (Idaho 1989) (use of roadway by adjoining landowner and his predecessors to access water sources and to facilitate farming operations did not, standing alone, establish regular and customary use by public of roadway).

Additionally, as in *Homestead Farms*, 119 P.3d 630 (Idaho 2005), the 1998 ACHD Official Map presents its own set of issues when applied against the language of Idaho Code § 40-202. There, the Idaho Supreme Court found that the Teton County Board of Commissioners erred in creating a map showing public highways throughout Teton County:

> Under § 40-202, Teton County is clearly obligated to adopt an official map of the County's highway system. However, the process contemplates that a county will first establish what public highways are located within the county, and then adopt the official map of the highway system, which shows the approximate location of these highways. The process by which a county selects a highway system or creates an official highway map does not also serve to adjudicate the public status of any roads within the county or create new public highways or rights of way. . . . .

> When fulfilling their duty under I.C. § 40-202(6) to update and publish their official highway map, county commissioners should only adopt a map of already existing and accepted public highways; it is not a tool, in and of itself, to create those public highways. Certainly if a road is not properly created as a public highway, its inclusion on an official county highway system map does not make it so, nor does it impose any requirement on a property owner to vacate what has never been established as a public roadway. The Commissioners erred in placing these three disputed roads on the purported official map and requiring Homestead and Hall to initiate proceedings to vacate them, absent clear evidence these roads were established existing public highways.

*Id.* at 634-35; *accord Halvorson v. North Latah Cnty. Highway Dist.*, 254 P.3d 497, 503 (Idaho 2011) . Similarly, the validity of including the Road on the 1998 Official Map is not without criticism. Up to that point in time (and even beyond, as indicated by Resolution 1066 in 2012), ACHD consistently took the position that the Barneses' 1974 and 1975 Deeds of Dedication

were never accepted.  *See, e.g.*, (Pls.' Exs. 1006, 1005, & 1012, Bates ACHD000655).[30]  At the

very least, this calls into question whether, under Idaho Code § 40-202(3), the Road was

properly created as a public highway by virtue of its mere inclusion on the 1998 Official Map.[31]

Without the record establishing the public's use of the Road for at least five years, Idaho

Code § 40-202(3) does not apply to convert the Road into a public-right-of way.  Old Republic

has not met its burden on this issue.

2.      Quasi-Estoppel/Permissive Use

Quasi-estoppel stands for the proposition that "one cannot blow both hot and cold."

*KTVB, Inc. v. Boise City*, 486 P.2d 992, 994 (Idaho 1971).  In Idaho, quasi-estoppel applies

when: "(1) the offending party took a different position than his or her original position, and (2)

either (a) the offending party gained an advantage or caused a disadvantage to the other party;

(b) the other party was induced to change positions; or (c) it would be unconscionable to permit

the offending party to maintain an inconsistent position from one he or she has already derived a

benefit or acquiesced in."  *Allen v. Reynolds*, 186 P.3d 663, 668 (Idaho 2008).

---

[30]  This reality makes Steven Price's July 10, 2012 unequivocal statement that "[o]ne thing is for certain – Barnes deeded the road" a bit odd, while amounting to a possible about-face in positions from ACHD.  (Old Republic Ex. No. 2011).  Mr. Price may think that the Barneses properly deeded certain property and that Ada County accepted it, but the balance of the record does not support such a statement.  *See* (Joint Ex. 7) (Resolution 1066 acknowledging that the Barneses' various offers of dedication "ha[ve] never been formally accepted by ACHD.").

[31]  Despite these shortcomings, Old Republic notes that neither Plaintiffs nor their predecessors in interest ever timely objected to ACHD's placement of the Road on the 1998 Official Map.  *See* Old Republic's Proposed FOF/COL, p. 27 (Docket No. 160) (quoting *Halvorson v. North Latah Cnty. Highway Dist.*, 254 P.3d 497, 506 (Idaho 2011) ("This Court has stated that "[i]f a landowner believes the acquisition of a roadway pursuant to I.C. § 40-202 results in a taking, the landowner has four years from the accrual of the cause of action to bring a claim for inverse condemnation." (quoting *Ada Cnty. Highway Dist. v. Total Success Inv., LLC*, 179 P.3d 323, 332 (Idaho 2008))).  Plaintiffs do not address this point.  Regardless, having determined that the Road had not been continuously used by the public for at least five years, this Court need not resolve this nuanced aspect to decide whether Idaho Code § 40-202 applies to provide Plaintiffs with legal access to the Property.

According to Old Republic, Ada County's actions during its 29 years of ownership of the section of the disputed Road – for example, (1) issuing building permits to "upstream" landowners and allowing them to use (and place signs declaring their right to use) the Road, (2) the Ada County Development Services' 1999 Property Status Report indicating that the Property was eligible for a building permit, and (3) not disputing the 1984 title policy listing the Easement as an encumbrance – would have precluded Ada County from ever attempting to deny Plaintiffs access to the Property under the doctrine of quasi-estoppel. *See* Old Republic's Proposed FOF/COL, pp. 29-30 (Docket No. 160).

The infirmity of Old Republic's theoretical argument lies in the fact that it presumes a contest that did not exist – namely, it presents a possible defense to Ada County's non-existent quiet title action. This Court will not engage in rendering an advisory opinion on matters that could have taken place (but did not) in a hypothetical proceeding involving entities not a party to the instant action. *See Daien v. Ysursa*, 711 F. Supp. 2d 1215, 1228 (D. Idaho 2010) (Federal court's role "'is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution.'") (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1122 (9th Cir. 2009)).[32]

_____

[32]  It should also be noted that quasi-estoppel does not neatly apply to governmental entities. *See, e.g.*, *Naranjo v. Idaho Dept. of Correction*, 265 P.3d 529, 533 (Idaho Ct. App. 2011) ("Estoppel may not ordinarily be invoked against a government or public agency functioning in a sovereign or governmental capacity."); *Kelso & Irwin, P.A. v. State Ins. Fund*, 997 P.2d 591, 599 (Idaho 2000) ("The general rule is that administrative officers of the state cannot estop the state through mistaken statements of law."); *U.S. v. Rodriguez*, 2011 WL 1458231, *4 (D. Idaho 2011) ("The Supreme Court has recognized that the Government may not be estopped on the same terms as any other litigant because [w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. Nor should the doctrine apply where the shift in the government's position is the result of a change in public policy, or a change in facts essential to the prior judgment. The Supreme Court has repeatedly indicated that

Without an actual change in position to consider here, the doctrine of quasi-estoppel cannot be used to somehow prove that Plaintiffs had legal access to their property as of June 15, 2009. Old Republic has not met its burden on this issue.[33]

3.  Easement by Prescription

A party seeking to establish the existence of an easement by prescription "must prove by clear and convincing evidence use of the subject property which is characterized as: (1) open and notorious; (2) continuous and uninterrupted; (3) adverse and under a claim of right; (4) with the actual or imputed knowledge of the owner of the servient tenement (5) for the statutory period." *Hodgins v. Sales*, 76 P.3d 969, 973 (Idaho 2003).

Old Republic argues that, notwithstanding any termination of the Easement, an easement by prescription existed (or more accurately, would have existed) in the name of Plaintiffs' predecessor-in-interest owing to the latter's undisputed use of the Road on a daily basis to access her home between December 31, 1977 (the date the Easement terminated) and September 30, 1984 (the date Terteling sold the Property to Ada County). *See* Old Republic's Proposed FOF/COL, pp. 30-31 (Docket No. 160).

_____

an estoppel will rarely work against the government . . ., and we recently stated that a private party trying to estop the government has a heavy burden to carry.") (internal quotations and citations omitted); *but see Idaho Wool Growers Ass'n, Inc. v. State*, 302 P.3d 241, 348 (Idaho 2012) ("Although estoppel is generally not applicable to state agencies acting in a sovereign or governmental capacity, it may apply where required by notions of justice and fair play."). This Court makes no determination on this point; only to raise it as an additional obstacle for Old Republic to prevail on this issue.

[33] It is unclear how or to what extent Old Republic attempts to use the doctrine of permissive use to establish that Plaintiffs had legal access to their Property, above-and-beyond what is already subsumed by its quasi-estoppel argument. *See generally* Old Republic's Proposed FOF/COL (Docket No. 160). Therefore, to the extent necessary, this Court also finds that Old Republic did not meet its burden on this issue.

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 43**

Here again, Old Republic's argument rests upon a hypothetical and, necessarily, abstract claim – in this instance, a claim that might have existed for a prescriptive easement. As with Old Republic's argument concerning the doctrine of quasi-estoppel (*see supra*), the argument rests upon a supposition, not a result. Certainly, had a documented, prescriptive easement been conceded to, or adjudicated, as of June 15, 2009, a strong argument could be made that Plaintiffs had legal access to the Property as of that date. But there is neither any such event, nor documentation creating the bones of such a result. *See, e.g.*, (Day 1 Tr. 83:25-84:6) (Plaintiff Guenther testifying that he was never able to identify, nor was he provided a document in the record establishing an access right, including prescriptive easement); *see also* (Day 1 Tr. 270:15-24) (Richard Beck, Associate Planner for Ada County Development Services testifying to same). Other than the Grant of Easement, there is no document (whether in the form of a judicial decision, a recorded instrument, a contract, or otherwise) that would potentially provide a right of access for Plaintiffs to have legal access to the Property. The possibility that a predecessor-in-interest might have been able to make such a claim cannot substitute for the fact of the existence of a prescriptive easement, allowing access to the property on June 15, 2009.

In the context of this dispute, absent an established easement by prescription as of June 15, 2009, it cannot be *assumed* that Plaintiffs in fact had an easement by prescription as of that same date. Old Republic has not met its burden on this issue.

///

///

///

///

# IV.  CONCLUSIONS OF LAW[34]

The Court's jurisdiction in this action is based on diversity of citizenship.  Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), "federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law."  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  Therefore, Idaho's substantive law applies to the claims/issues presented for this Court's consideration.

1.      Plaintiffs originally asserted the following causes of action against Old Republic: (1) Declaratory Judgment – No Right of Access (Count I); (2) Declaratory Judgment – Policy Coverage Applies (Count II); (3) Bad Faith Tort (Count III); (4) Breach of Contract (Count IV); (5) Negligence (Count V); (6) Breach of Fiduciary Duty (Count VI); (7) Breach of Implied Covenant of Good Faith and Fair Dealing (Count VII); and (8) Intentional Infliction of Emotional Distress (Count VIII).  This Court previously dismissed Plaintiffs' claims for breach of contract (Count IV) and intentional infliction of emotional distress (Count VIII).

2.      By stipulation, the parties agreed to resolve the remaining causes of action in bifurcated stages.  Also by stipulation, the parties agreed that the sole issue to be resolved by this Court during the first portion of the bifurcated trial was whether Plaintiffs had legal access to their Property as of June 15, 2009.  The parties agreed that the resolution of that question required the determination of some or all of the following questions:

1.      Whether the Barnes Main Access Road was improved as required by the 1973 Grant of Easement between Terteling Land Company and Joseph and Lillian Barnes (the "Easement") ("Issue No. 1");

---

[34]  To the extent any of the Conclusions of Law stated in this Section can be considered Findings of Fact and are not already stated in Section II, they are incorporated by reference into that Section.

2.    If not, whether the Easement's reversionary clause was automatic or subject to a right of re-entry ("Issue No. 2");

3.    If the Easement was subject to a right of re-entry, whether the requisite action was taken by Ada County and/or its predecessors-in-interest to terminate the Easement ("Issue No. 3"); and

4.    If the Easement terminated, whether legal access existed by virtue of any of the following alternative access theories: (1) Idaho Code § 40-202/Public Right-of-Way; (2) Quasi-Estoppel/Permissive Use; and (3) Easement by Prescription ("Issue No. 4").

3.    It is Plaintiffs' burden to prove Issue No. 1.

4.    It is Old Republic's burden to prove Issue Nos. 2-4.

5.    Plaintiffs proved that the Barnes Main Access Road was not improved as required by the 1973 Grant of Easement between Terteling Land Company and Joseph and Lillian Barnes (Issue No. 1). The evidence is in conflict; however, the Court is persuaded that it is more probable that the required improvements were not made by December 31, 1977.

6.    Old Republic did not prove that the Easement's reversionary clause was subject to a right of re-entry (Issue No. 2). Instead, the Easement automatically reverted back to Terteling on December 31, 1977 because the Barnes Main Access Road was not improved as required by the 1973 Grant of Easement between Terteling Land Company and Joseph and Lillian Barnes.

7.    Because the Easement was not subject to a right of re-entry, this Court need not determine whether the requisite action was taken by Ada County and/or its predecessors-in-interest for the purpose of terminating the Easement. Issue No. 3 is moot.

8.    Old Republic did not prove that Idaho Code § 40-202 applies to the facts of this case so as to provide Plaintiffs with legal access to the Property as of June 15, 2009, and this Court rules as a matter of law that Idaho Code § 40-202 does not create a public roadway on the facts of this case.

**MEMORANDUM DECISION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW - 46**

9.     Old Republic did not prove that the doctrines of quasi-estoppel or permissive use provided Plaintiffs with legal access to the Property as of June 15, 2009.

10.     Old Republic did not prove that an easement by prescription provided Plaintiffs with legal access to the Property as of June 15, 2009.



DATED:  **November 7, 2014**



Honorable Ronald E. Bush
U. S. Magistrate Judge